Good morning, Your Honors. May it please the Court, I'm Jeffrey Baird representing Ms. Goulart in this disability case. This is a Title II insurance case with a date last insured of December 2007 and an onset December 2006. So we have the burden of showing disability beginning during that period and continuing for a stretch afterwards. The ALJ made important harmful errors in his decision. Most important, the treating physicians who examined and treated plaintiff on a very routine basis throughout Dr. Crawford, especially throughout 2007, and then Dr. Benson beyond that in 2008. Dr. Benson found after one-hour visits on a regular basis that during the period at issue, the claimant would not have been able to withstand or had marked impairment in tolerating routine changes, routine stresses, usual work situations, getting along with supervisors, getting along with coworkers. All of those factors would undermine the jobs the V.E. found, which were production pace. And they also would fall within SSRs 969P, 85, 15, and establish a high probability of a disability, inability to sustain substantial gainful activity. We have two treating physicians who give opinions in this case. As to Dr. Crawford, there seemed to be – well, as to Dr. Benson, I'm sorry. The ALJ goes through it and says, I see what the treating physician says, but I don't see anything in his treatment notes that support this, and there's other inconsistencies with the record. Why can't the ALJ reject Dr. Benson's opinion? I want to get to Dr. Crawford separately. Yeah. On the Dr. Benson one, the ALJ seems on firmer ground to me. Well, there were hour-long visits every three weeks or so, and Dr. Benson did articulate conversations he had with her, observations he made clinically. I think in the opening brief I went through session by session what Dr. Benson observed and what he heard, both the content of what she said and the way she said it. Well, but he's recounting what she's saying. Is his treatment consistent with disability? It's talk therapy, but he's also watching her. Remember, he observes pain behavior. He observes fatigue. He connects those with the depression, and he puts that together and finds difficulty sustaining persistence and pace. So he has observed her firsthand on many, many visits. He's heard what she said, but also how she said it. But let's go back to the standard. The ALJ can contradict treating physicians' opinions or can reject them if he finds them internally inconsistent, other evidence in the record, et cetera. I think your stronger argument is with respect to Dr. Crawford, but I want to focus on Dr. Benson for a moment. Why aren't the reasons offered by the ALJ sufficient? I understand your reading of Dr. Benson's records or that he supports your position, but the ALJ reads Dr. Benson's records and says they really don't support his opinion. I've looked at the various things in them. He cites various things in the record. He was the trial judge. Why isn't that enough? Well, the record as a whole included a lot of evidence from prior to the period at issue. Also, the record as a whole, the treating record, comes from Crawford and Benson, so they would have the highest rank of any physicians. Say it a little directly. Would you concede that the ALJ's reasons for rejecting Crawford are not as sound as the reasons for rejecting Benson? I mean, do you make a distinction there? I think I can make that distinction, but I found, I argue the reasons were insufficient for both. Both. I understand that. But would you agree that the ALJ had better reasons for rejecting Benson than he did for rejecting Crawford? Somewhat. Here's the thing. Again, Dr. Benson observed pain behaviors and fatigue. Now, he's a psychologist. He can't make a diagnosis, but he can observe those things. And he can connect them with mental impairments, the depression. In particular, I think the depression was connected with the pain behaviors and fatigue. So he can put those things together with firsthand observations in the treatment context as a psychologist. And the ALJ didn't really put together, well, there's a lot of visits. There's a lot of firsthand interaction. What are the jobs like the VE found? Their production pace. Dr. Benson would tend to indicate she couldn't handle the production pace. And the rulings show the same thing. But, yeah, the record as a whole, much of it doesn't relate to the period at issue. And to the extent it does, the treating record in and around the period at issue is from Benson and Crawford. I was very struck by the tone and detail of the husband's letter. Yes. I gather it was not presented to the ALJ, but only to the Appeals Council. Is that right? The yes. The really sincere letter came to the Appeals Council. The late testimony came. He filled out a form. I saw that. Right. But the letter really only goes to the Appeals Council. Correct. The letter went into deep detail describing the experience of her decline, the claimant's decline over the period at issue. It's clear that the ALJ rejected her claim in part because of the inconsistency of the disability she claimed with the work record, the work record being that she was being paid to deliver papers. She says, oh, but actually I wasn't doing it because even though my name was sort of on the work records, we'd asked him to change it, but he didn't, but I wasn't doing the work anymore. It's clear that the ALJ didn't believe that because he talks about the inconsistency between her reported inability and her work record. It struck me that if I'd only heard her, because she said it quickly, she said it consistently with what the husband said, but if I'd only heard her, I might be inclined to disbelieve her too, but after I read the husband's letter, I was inclined to think that that was a true story. Right. It had great detail. It had firsthand observations. It had sincerity. It gave an explanation in some detail of what was going on. Should we send it back to the ALJ so that not just the appeals counsel, they're reviewing on a cold record and so on, but send it back to the ALJ, hey, listen, we've got the case we've got. This may change your view of things. Read this letter. That would be one remedy. I think reversal is important because that error is harmful. It causes substantial probability of prejudice. So you could send it back for the ALJ. Scalia. I guess what Judge Fletcher is asking, at least what I think he's asking, is even if the appeals counsel didn't make an error in refusing to consider the letter, if we send this case back for any reason, will the ALJ be able to, shouldn't the ALJ be able to consider the letter? Yeah, the ALJ would have to consider the letter. It's part of the record as a whole. That's been established under Bruce, the incorporation. If we send it back, you'd be authorized to, I mean, the record would be open for you to submit that. Or do we, should we, I guess we should specify what. Well, the letter is in, as you say, the letter is in the record. So if it goes back, the ALJ can see it. Is the letter itself a sufficient basis for remand? Or do we need also to find something like, well, you know, the ALJ improperly discounted some of the things that Dr. Crawford diagnosed? I'd say it's sufficient. You could just credit that letter. But you have to then, you have to then persuade us that it so undermines the ALJ's findings. That's right. That's the argument. That the appeals counsel should have, the appeals counsel erred, not the ALJ. You understand Bayes' theorem. I'm sorry about that. I got carried away on a wild night writing that. But that's a pretty high burden, is it not? And the appeals counsel then says, well, maybe, but why? It's the husband's letter. Why did you wait so long to submit it? Well, under Bruce, the husband, the claimant can present new evidence to the appeals counsel. I know the question. Why did you wait so long? Not whether you could wait. Well, he did respond with sincerity. I can't explain it. I guess I'm saying I'm reluctant to tell the appeals counsel you erred in your conclusion that this letter came too late because it's from a source that your client had pretty ready access to. And so perhaps, I guess answering Judge Bailson's question, we need to have some other reason other than the letter, in my view, to send this back, because the appeals counsel probably correctly said this is just too late. And cumulative. I mean, it says what she said. Why don't you turn to the Crawford? Yeah. Well, Dr. Crawford, again, had regular visits with the claimant. He observed massive obesity, 315 pounds, 320 pounds. He found chronic low back pain associated at least with fibromyalgia. He sent her out for an MRI. There was a disc herniation, but no contact with the nerve root. He felt the obesity and the chronic low back pain were interlinked, and he also found depression again. So let us assume for purposes of, you know, to save you some time, that Dr. Crawford's opinion, if believed, Dr. Crawford's records, if believed, would establish disability. The ALJ discounted it. The ALJ said, I'm giving it very limited weight. Why was that an error? I think you submitted enough evidence which, if believed, would have established disability. The ALJ rejected this evidence. Why was that? Why was it an error in him rejecting it? First of all, Dr. Crawford was the central treating physician, the global treating physician, who sent the claimant out to Dr. So for neurological evaluations and so forth. So he had the Olympian perspective, if you will, of what's really going on with her. So he had the best detailed evidence of any in the record. It should be a court of the greatest weight. The ALJ rejected it on grounds of daily activities, but the daily activities were well explained in the lay testimony by Ms. Huckabee, saying she has to stop and rest as she does chores. She can do things, but she takes breaks or she gets distracted or tired, and that's consistent with her own testimony and the husband's. So Dr. Crawford can't really be rejected on daily activities. There was some driving that she did, but the husband explained that grew less and less. She couldn't do the production of the newspapers. She finally had to just begin to just drive and then less and less of that. So Dr. Crawford actually acknowledged some driving. He talked about her medication and her compliance. The physical therapy fell apart because she fell into too much pain. So he actually, Dr. Crawford, stopped the physical therapy. So it's not the reasons the ALJ gave simply didn't rise to the specific legitimate standard, particularly when Dr. Crawford's considered as a whole with Dr. Benson, the husband's testimony, and his letter, as well as Ms. Huckabee. Am I right? Is there any other medical evidence in this record? There's medical evidence, but much of it predates. Right, right. But with respect to the time, the period in time, is there any contrary medical evidence on the disability issue? I think just the reviewing physicians. Right. And if that's true, that's not substantial evidence, right? That's the rule in Murray v. Heckler. You answered the question that I meant to ask. Now, other than the reviewing physicians, there's no medical evidence contrary to disability. Right. Okay. Right away from the government. Right. Thank you, Your Honor. If it may please the Court, Kathy Rae for the Commissioner. Key to the discussion earlier today is the fact that Ms. Goulart repeatedly reported to the agency that she worked as a newspaper deliverer through June 2007 until the hearing. When she applied for benefits, she reported that she stopped working on June 30, 2007. She followed that up with a work history report in which she listed a newspaper delivery route that she worked at until June 2007. She described the job as requiring her to put ads into newspapers, deliver those newspapers. It required, according to her own reports, 4 1⁄2 hours of standing, 5 1⁄2 hours of stooping, 1 1⁄2 hours of kneeling, 3 hours of reaching, 5 1⁄2 hours of handling small items. Excuse me. And she performed these on a daily basis. The agency followed up with her because it was self-employment and she filled out a self-employment form and reported that she earned income up to $8,000 in 2007 for work from January to June 2007. The job required her to drive, stand up to 6 1⁄2 hours, make decisions about how to do the route, make decisions about where the papers should go. She resolved customer service complaints and she worked up to 60 hours a week. In addition, the citation most frequently found in the ALJ's decision for this issue, her earnings records reported earnings for her through June 2007. Let me ask you first. I'm sorry. Let me ask the question this way. It may well be that the ultimate result below was correct. My question is a slightly different one. We have a treating physician whose opinion is rejected.  Did the ALJ sufficiently document why he rejected that position? The ALJ explained. No, you're suggesting that the case was tried, it comes out the same way. My question is a procedural one. You have to give very good reasons for rejecting a treating physician's opinion. My sense is the ALJ did a good enough job with respect to Dr. Benson, but with respect to Dr. Crawford, I'm having some difficulties getting there. So tell me why I should get there. In terms of one of the reasons the ALJ provided for discounting Dr. Crawford's assessed limitations was Ms. Goulart's daily activities. Throughout the decision, the ALJ found her work activity as one of her daily activities to be highly significant evidence of her abilities. Does that contradict Dr. Crawford's opinion that Ms. Goulart had limited mobility and could not stupor crouch? Yes, directly. Well, is there a case that you can rely on where a court has said that that's enough to reject the treating physician's personal observations and opinions? I believe it was Morgan v. Commissioner. Woodmore? Excuse me? Woodmore, you say? Morgan. Morgan, I'm sorry. Morgan, which it is cited in my brief. I can attempt to find it for you if you'd like. Okay. Thank you. Just go ahead. Yes, Dr. Why don't you answer Judge Hurwitz's question? Yeah, I'm trying to find where in the record there's a contradiction of Dr. Benson Dr. Crawford's opinion, I'm sorry, that during the relevant time period, Goulart had limited mobility and could not stupor crouch. I don't see anything in his records that indicate that's an incorrect observation. You're saying there was something that her testimony contradicted that? She filled out a series of forms, yes, and one of those is called a work history report, and it can be found at 169 to 171 of the record. And in it, she reported the newspaper delivery job, which she did through June 2007, required five-and-a-half hours of stooping a shift. It also required three hours of reaching, five-and-a-half hours of handling big items, and five-and-a-half hours of handling small items. And I believe those abilities which she acknowledged in that form as part of her daily activities, her work activity during that time period, directly contradicts Dr. Crawford's statements that she was limited to no stooping, no kneeling, no crouching. He limited her to less walking hours. I believe it was one hour per shift that Dr. Crawford limited her to, where she reported she walked up to three hours per newspaper delivery. Moreover, there's the issue of the fact that Dr. Crawford links his disability finding back to 2004. He multiple times says that she became disabled back in 2004, which is when she was diagnosed with her laugh syncope. However, in 2004, the record shows that that was the year that Ms. Goulart started her own daycare. She reported that at the daycare, she did everything a mother would do. She taught preschool. She helped with homework. In May 2005, Howard Taylor wrote Dr. Crawford a letter saying that Ms. Goulart was working 18 hours a day as a daycare provider. He noted that despite her laugh syncope, she continued to deal without much impairment. She never had loss of control that affected her ability to provide daycare or drive. The ALJ repeatedly found that Ms. Goulart's ability to perform these work activities contradicted Dr. Crawford's assessment of disability back to 2004, along with other evidence in the record. Additionally, the medical evidence further shows that this ---- Let me ask you again. I'm looking at the ALJ's opinion. Yes. And I'm looking at page 9 of 11, and there's a paragraph here that says, I gave little weight to Dr. Crawford's medical opinion for several reasons. The first one is that his conclusions are reserved to the commissioner. Then he says they're not supported by his treatment notes. Yes. And then he simply says, lastly, his opinion is not supported by the claimant's activities of daily living and the medical evidence as a whole. You're saying things that he didn't say but might have said. Doesn't he have to say those in order to reject the treating physicians? The ALJ discussed this throughout his decision. While his paragraph on Dr. Crawford is brief, I believe it should be read in the context of the ALJ's decision as a whole. And ---- So we're supposed to go back and look at the record and figure out what things the ALJ might have cited in rejecting the treating physician's opinion, rather than him telling us why he's rejecting the treating physician's opinion. No, Your Honor, that's not my position at all. My position is that you look within the ALJ's decision and look at that statement within the ALJ's decision regarding Dr. Crawford within the context of the other parts of the ALJ's decision. And, for example, the ALJ went through impairment by impairment and discussed why various impairments were not as severe as alleged. I'm looking at a different version of this. I apologize. I'm looking at page 14. Yeah, but that's fine. They're numbered at the top, so. Page 7 of the ALJ's decision, he goes through Dr. Crawford's diagnosis of fibromyalgia and references her work as a newspaper distributor in 2007. And he's referring to her 5-hour shift that's reflected in Dr. So's treatment notes that we just discussed. I'm sorry, we discussed a few minutes ago, that says in 2007, she was working from midnight to 4.30 a.m. before sleeping an hour and getting up and doing child care duties, which is evidence that the ALJ discussed on page 7 of 11 of his decision. The ALJ also discussed the diagnosis of depression in April 2004 in that same section and talked about how Dr. Crawford's treatment notes indicated her depression was stable shortly after she noted her to be much improved. So the commissioner's position is that while the ALJ's actual paragraph, when he gives Dr. Crawford's opinion little weight, references her daily activities and his treatment notes, the ALJ's analysis of those treatment notes and daily activities can be found throughout the ALJ's decision. In that decision, he relies heavily on Ms. Goulard's ability to perform work activities inconsistent with the limitations that Dr. Crawford assessed through June 2007, several years after Dr. Crawford assessed her to be disabled. There's additional evidence in the medical records to support this. In July 2005, Dr. Taylor also wrote Dr. Crawford another letter saying that Ms. Goulard had never had a lapsing B episode while at work. She was too busy. In November 2005, Dr. Howard wrote Dr. Crawford yet another letter and talks about how it wasn't the actual impairment that caused difficulties with her providing daycare for the three children she was, but the social issue that arose when she informed the parents about her lapsing B. Dr. Crawford himself, in August 2006, continued to list her job as a newspaper deliverer and noted that she was required to stand on her feet while folding and delivering papers. And finally, the May 2007 Dr. Soe reference that we talked about earlier in the ALJ's decision, in which she was working five-hour shifts before sleeping for an hour and waking up and performing childcare. I believe these facts also address Your Honor's argument about whether or not the husband's letter is sufficient to return this case to the agency for an evaluation of the letter that he wrote. And the Commissioner's position is that it is not. That while it is relevant evidence for this Court to consider whether or not substantial evidence still supports the ALJ's decision, in light of the ALJ's reliance, consideration of whether or not she performed this work and his finding that is supported by the record that she did, in fact, perform this work through June 2007, Mr. Gulag's statement is merely duplicative of evidence that the ALJ soundly rejected. Counsel in briefing points out a stooping limitation. He's referring to a statement in Mr. Gulag's letter that is talking about the assessment of limitations that Dr. Crawford has assessed for Ms. Gulag. And in the context of that, he says, and she can't bend. But the ALJ noted in summarizing Dr. Crawford's treatment notes in his decision that he had assessed a limitation to no stooping and found that, among the other limitations that Dr. Crawford assessed and linked back to 2004, incompatible with her ability to stoop five and a half hours in a job that she performed until six months into the period of alleged disability. So therefore, the Commissioner's position is that it is not the appropriate case to remand on a letter from Ms. Gulag's husband disagreeing with the ALJ's credibility finding, especially in light of the fact that it was Ms. Gulag and her attorney who brought the issue to the ALJ's attention at the hearing. They first brought it to the ALJ's attention in the hearing in the context of what her date last insured was and whether or not it might move if she had taken the position that she did not, in fact, do that job. The ALJ followed that up with a question to Ms. Gulag and said, am I understanding you correctly that you are saying you did not perform that job? And she said, yes, that is my position. I stopped working at that job in May 2006. This was not an issue that the ALJ did not communicate was under consideration. It was, in fact, an issue that Ms. Gulag was aware of and brought to the attention of the ALJ, yet did not request the opportunity to have a statement from her husband submitted into the record until after the ALJ issued his adverse decision. I know this may be neither here nor there from what you're saying, and it puzzled me a little bit. The date of this letter is July 11. The date of the ALJ's decision is July 30 of that same year. But I gather it was not submitted to him before he rendered his decision. I did not catch that, Your Honor. But my— So I'm assuming it was not submitted to the ALJ. To the best of my understanding of the record, it was not. If I remember correctly, it was when the Appeals Council receives evidence, they attach exhibit numbers to it and annotate those within the record. And if I remember correctly, and unfortunately I don't have a cite for you, but I can find one if you'd like, my understanding is that letter was annotated in that section in terms of the evidence submitted to the Appeals Council. When and to whom it was presented. Yes, correctly. If Your Honor has no further questions. Thank you. Thank you. Response. Yes, Your Honor. The period at issue begins in December 2006. So prior evidence shouldn't carry as much weight as the relevant stuff to when she said she can't work anymore. She did say things, but Dr. Crawford in particular relied on what he saw, what he measured, 315 pounds, chronic low back pain, positive straight leg raise. Dr. Soe even found no reflexes in the right ankle. The letter the husband wrote was to the lawyer and it was prior to the ALJ's decision. It can still come in under the bruise rule. So the fact it was written without reference to the ALJ's decision would indicate possibly greater weight that should be afforded to the letter. But what do we do with evidence that your client worked during the disability period? Well, the administrative law judge found no substantial gainful activity during the period at issue. So she's not working at a work level. She's not doing substantial gainful activity. And the husband has explained, I think very sincerely, she did some driving, but she couldn't do the production of the papers and the actual deliveries. And even the driving declined over time. That would be very important evidence to understand what her daily activities amounted to. The medical opinions weren't unduly resting on particular content of her statements. Although that was a factor. It was on a cross-thatching of ordinary medical observations, clinical assessments, and most importantly, frequent visits in an effort to cure. And each visit lasting half an hour, an hour, for Dr. Benson's somewhat longer visits than for Dr. Crawford. So when he says, Dr. Crawford, stable now, improved, that doesn't mean and now outside of the limitations I've assigned. It means, all right, it's helping to have the extraordinary meditative regime. We're getting stable. That's it. Thank you. Thank you very much. I think both sides for your good arguments. Goulart v. Colvin now submitted for decision. And that completes our argument calendar for the week. Thank you very much. All rise. This court for the session stands adjourned.
judges: Baylson, Fletcher, Hurwitz